UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Scott Equipment Company,

Plaintiff,

v.

Civ. No. 01-906 (JNE/JGL)
ORDER

Stedman Machine Company, a division of
Eagle Crusher Company, Inc.,

Defendant.

---

Michael D. Schwartz, Esq., and Andrew A. Dean, Esq., Schwartz & Dean, P.A., appeared for Plaintiff Scott Equipment Company.

Kathleen I. Lee, Esq., Bose McKinney & Evans LLP, and Nicholas M. Lewandowski, Esq., Meagher & Geer, P.L.L.P., appeared for Defendant Stedman Machine Company, a division of Eagle Crusher Company, Inc.

---

This case involves two competing companies, Scott Equipment Company (Scott) and Stedman Machine Company (Stedman), that designed and developed similar industrial grinders in the 1990s. Scott claims that Stedman willfully and maliciously misappropriated detailed drawings of its grinder, in violation of the Minnesota Uniform Trade Secrets Act, Minn. Stat. ch. 325C (2002) (MUTSA), and Minnesota's common law of unfair competition. The case is before the Court on Stedman's Motion for Summary Judgment. For the reasons given below, the Court denies the motion.[1]

---

1 After the motion hearing, the Court received a letter from Scott discussing a state-court action related to Scott's grinder and requesting leave to supplement the record with trial testimony from that action. The Court denies Scott's request, and it has not considered any of the information in Scott's letter in deciding Stedman's motion.

AUG 0 1 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED
DEPUTY CLERK'S INITIALS

## I. BACKGROUND

Scott designed and developed its grinder in 1993 and 1994. Among the engineers who worked on the project were William Luker and Rick Nelson, both of whom were Scott employees, and an outside consultant, David Phillips. Luker, Nelson, and Phillips were involved in creating detailed drawings of Scott's grinder.

In December 1995, Luker left his employment with Scott and went to work for ITS. The following month, Nelson resigned from Scott and joined Luker at ITS. At some point in 1997, Stedman contacted Luker and asked him to design and develop a grinder for Stedman. Luker agreed to do so. While Stedman, Luker, and a company created by Luker, Midwest Mill Parts (MMP), negotiated an agreement, Luker started working on the project, assisted by Nelson and Phillips.

By May 1998, Luker had completed a set of drawings (MMP drawings) for Stedman. That month, Stedman unveiled a prototype of its grinder at a trade convention. Within days of seeing the prototype at the convention, Scott contacted Stedman and accused it of copying Scott's grinder. Communications between Scott and Stedman continued through September 1999.

Meanwhile, in May 1999, Stedman, Luker, and MMP completed negotiations and entered into an agreement whereby Stedman agreed to purchase the MMP drawings. The agreement included a representation by Luker and MMP that they had not used any of Scott's intellectual property in creating the drawings. After purchasing the drawings, Stedman used them to produce its grinder.

Scott brought this action in Minnesota state court in April 2001, alleging that Stedman misappropriated Scott's trade secrets related to its grinder. Stedman removed the action to this

Court on the basis of diversity jurisdiction, 28 U.S.C. § 1332(a)(1) (2000), and now moves for summary judgment.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. MUTSA

The MUTSA authorizes a civil action for injunctive relief and damages against any person who misappropriates a trade secret. *See* Minn. Stat. §§ 325C.02 (injunctive relief), 325C.03 (damages). If the misappropriation is willful and malicious, the owner of the trade secret can also recover exemplary damages and reasonable attorneys' fees. *Id.* §§ 325C.03(b) (exemplary damages), 325C.04 (attorneys' fees).

Scott claims that the drawings of its grinder created in 1993 and 1994 are trade secrets, and that Stedman, through Luker, Nelson, and Phillips, willfully and maliciously

misappropriated the drawings, allowing Stedman to design and develop the Stedman grinder in 1997 and 1998. Stedman argues that (1) the drawings are not trade secrets, (2) Stedman did not misappropriate the drawings, and (3) even if the drawings are trade secrets and Stedman misappropriated the drawings, the misappropriation was not willful and malicious. The Court will consider each argument in turn.

*1. Trade secret*

The MUTSA defines "trade secret" as any information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* § 325C.01, subd. 5. To establish that Scott's drawings are trade secrets under this definition, Scott must demonstrate that (1) the information contained in the drawings was not generally known or readily ascertainable, (2) the information derived independent economic value from its secrecy, and (3) Scott made reasonable efforts to maintain the secrecy of the information. *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 899-901 (Minn. 1983); *Widmark v. Northrup King Co.*, 530 N.W.2d 588, 592 (Minn. Ct. App. 1995). Stedman's motion is limited to the first and third elements.

On the first element, the evidence in the record indicates that only a small group of engineers knows how to design and develop a grinder, and that not all features of the Scott grinder can be reverse-engineered. Based on this evidence, one could reasonably find that the information in Scott's drawings is neither generally known nor readily ascertainable. As for the third element, Scott has submitted affidavits stating that it told Luker, Nelson, Phillips, and others who helped design and develop the Scott grinder that Scott's drawings were trade secrets

belonging to Scott.[2] In October 1995, before Luker and Nelson ended their employment with Scott, Scott issued an employee handbook stating that Scott's trade secrets include information regarding pending projects and proposals, as well as technological information and prototypes. In addition, Scott kept its drawings in an area to which only a limited number of employees had access. This evidence would allow a rational factfinder to find that Scott made reasonable efforts to maintain the secrecy of its drawings. In sum, Scott has submitted evidence sufficient to permit a finding that its drawings are "trade secrets" within the meaning of the MUTSA.

2. *Misappropriation*

Under the MUTSA, misappropriation occurs when a person acquires, discloses, or uses a trade secret through "improper means," *see* Minn. Stat. § 325C.01, subd. 3(i); *Electro-Craft*, 332 N.W.2d at 903, which include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," Minn. Stat. § 325C.01, subd. 2. Scott's misappropriation theory proceeds in two steps. First, it argues that Luker, Nelson, and Phillips used the information in Scott's drawings to create the MMP drawings. There is evidence in the record supporting Scott's position on this point. For example, Phillips testified that he had some sketches of Scott's grinder when he worked on the MMP drawings. Based on a comparison of Scott's drawings and the MMP drawings, Scott's expert found it likely that Luker, Nelson, and Phillips used or copied Scott's drawings in creating the MMP drawings.

---

2 Stedman argues that the statements in the affidavits are inadmissible hearsay. Because the statements are being offered as evidence of Scott's efforts to maintain the secrecy of the drawings, and not "to prove the truth of the matter asserted" (*i.e.*, that the drawings were secrets belonging to Scott), the statements do not fall within the definition of hearsay. *See* Fed. R. Evid. 801(c).

The second part of Scott's theory is that Stedman knew or had reason to know that the MMP drawings contained Scott's trade secrets when it acquired and used the MMP drawings to produce its grinder. There is evidence supporting Scott's position on this point, as well. When Stedman first contacted Luker in 1997, it knew that Luker had worked on the design and development of the Scott grinder. By April 1997, Stedman also knew of potential litigation between Scott and Luker regarding his work on the Scott grinder. Almost immediately after the debut of Stedman's prototype grinder in May 1998, Scott accused Stedman of copying its grinder. Scott repeated the accusation in several calls and letters from May 1998 through September 1999. Stedman's president testified that he was "inundated" with such communications from Scott during this period. In letters sent in May and July 1998, Scott informed Stedman of its suspicion that Scott's former employees had been involved in designing and developing the prototype of Stedman's grinder.

Despite being put on notice of the possibility that the information in Scott's drawings had been used to create the MMP drawings, Stedman never asked Luker for any evidence to corroborate Luker's representations that he had independently created the MMP drawings, never asked an engineer to review the MMP drawings to determine whether they had been independently developed, and, aside from obtaining oral and written assurances from Luker that he had not used Scott's drawings, did not conduct any investigation into the matter. According to Stedman's president, Stedman did not know, and never asked, whether anyone helped Luker create the MMP drawings. Viewing this evidence in the light most favorable to Scott, a rational factfinder could find that Stedman knew or had reason to know that the MMP drawings contained Scott's trade secrets.

*3. Willful and malicious misappropriation*

The final issue raised with respect to Scott's MUTSA claim is whether, assuming the information in Scott's drawings constitutes a trade secret and that Stedman misappropriated the information, the misappropriation was willful and malicious. The Court concludes that the evidence outlined in the preceding section on misappropriation could support a finding in Scott's favor on this issue.

**B. Unfair competition**

In addition to its MUTSA claim, Scott asserts a tort claim for unfair competition based on Stedman's alleged misappropriation of trade secrets. Stedman argues that this claim is displaced by the MUTSA, which "displace[s] conflicting tort, restitutionary, and other law of [Minnesota] providing civil remedies for misappropriation of a trade secret." *Id.* § 325C.07(a). Insofar as the legal principles applicable to Scott's tort claim conflict with the MUTSA, those principles are displaced by section 325C.07(a). *See Electro-Craft*, 332 N.W.2d at 898 ("To the extent . . . that the [MUTSA] modifies the common law, we are constrained to give effect to the statutory language."); *Zawels v. Edutronics, Inc.*, 520 N.W.2d 520, 523-24 (Minn. Ct. App. 1994) (holding that MUTSA's provisions authorizing exemplary damages displaced conflicting statutory provisions authorizing punitive damages). To the extent that those principles are consistent with the MUTSA, Scott's tort claim is duplicative of its claim under the MUTSA.

**C. Waiver, laches, and equitable estoppel**

Scott commenced this action in April 2001, approximately nineteen months after its last contact with Stedman in September 1999. During those nineteen months, Stedman modified its prototype grinder and produced several grinders for customers. Based on these facts, Stedman argues that Scott waived its right to sue Stedman, and that Scott's claims are barred under the

doctrine of laches or equitable estoppel. The Court disagrees. With respect to waiver, the Court is unwilling to interpret Scott's silence as an "intentional relinquishment" of its right to sue Stedman. *See State v. Cassidy*, 567 N.W.2d 707, 709 (Minn. 1997) (defining waiver as the "intentional relinquishment of a known right"); *State v. Richards*, 456 N.W.2d 260, 264 (Minn. 1990) (same). As for laches and equitable estoppel, the Court is unable to conclude as a matter of law that Stedman was prejudiced by Scott's failure to commence this case sooner. Although Stedman notes that it incurred expenses in modifying and producing grinders after September 1999, it appears that Stedman engaged in the same activity *before* September 1999, when it was apparent that Scott was considering litigation. Thus, Stedman's decision to invest resources in its grinder could not have been the result of Scott's silence.

## III. CONCLUSION

Stedman has failed to establish that it is entitled to summary judgment on Scott's MUTSA claim or on its defenses of waiver, laches, and equitable estoppel. Therefore, IT IS ORDERED THAT:

1. Stedman's Motion for Summary Judgment [Docket No. 30] is DENIED.

Dated: July 31, 2003

JOAN N. ERICKSEN
United States District Judge